

# THE ATTORNEY GENERAL
# OF TEXAS

### AUSTIN, TEXAS 78711

**JOHN L. HILL**
**ATTORNEY GENERAL**

June 5, 1973

Honorable Byron Tunnell, Chairman
Railroad Commission of Texas
P. O. Drawer 12967, Capitol Station
Austin, Texas 78711

Opinion No. H-46

Re: Questions relating to the
applicability of Article
6005, Vernon's Texas
Civil Statutes, (the well-
plugging statute) to
"landowners" as that
term is defined in the
statute.

Dear Chairman Tunnell:

You have requested our opinion as to the applicability and effect
of Article 6005, V. T. C. S. (as amended, Acts 1965, 59th Leg., p. 762,
ch. 355) in seven hypothetical situations, relating to the definition of
"landowner" and to the extent of his responsibility for plugging aban-
doned wells. The most pertinent sections of the statute are as follows:

"Section 1. In this Article, unless the context
requires a different definition, . . . .

"(4) 'landowner' means the owner of the land
upon which the well is situated at the time the
well is abandoned and one who holds a mineral
interest therein;

"Section 4. If the operator fails to comply with
Section 2 of this Article and the nonoperator fails to
comply with Section 3 of this Article, then, in that event,
each landowner is responsible for his proportionate
share of the cost of proper plugging of the well within
a reasonable time, according to the rules and regula-
tions of the Commission in effect at the time the re-
sponsibility attaches."

"Section 5.  If a landowner plugs or replugs a well under Section 4 of this Article, then the landowner shall have a cause of action against the operator and nonoperator or either of them, as the case may be, in any court of competent jurisdiction for all reasonable costs and expenses incurred in the plugging or replugging of the well, to be secured by a lien upon the interest of the operator and the nonoperator, or either of them as the case may be, in the oil and gas underlying the lease upon which the well is located and upon the interest of the operator and the nonoperator, or either of them, as the case may be, in all fixtures, machinery and equipment found or used on said lease; provided, however, that if the landowner is responsible for the well not being properly plugged, then the said landowner shall not have a cause of action under this Article.

"Section 8.  (a) Upon the determination by the Commission under Section 7 (a) of this Article that such a well has not been properly plugged, or needs replugging, the Commission, through its employees or through a person acting as agent for the Commission, may plug or replug such a well, if

"(1)  the well was properly plugged according to regulations in effect at the time the well was abandoned or ceased to be operated; or

"(2)  neither the operator, nonoperator nor the landowner properly plugged the well, and

"(A)  neither the operator, nonoperator nor the landonwer can be found; or

"(B)  neither the operator, nonoperator nor the landowner has assets with · which to properly plug the well.

"Section 9. If the Commission plugs a well under Section 8 of this Article, the State has a cause of action for all reasonable expenses incurred in plugging or replugging the well acording to the rules and regulations of the Commission in effect at the time the well is plugged or replugged. The cause of action is first against the operator, to be secured by a lien upon his interest in the oil and gas in the land and all his fixtures, machinery and equipment, found or used on the land where the well is situated, and second, against the nonoperator at the time the well should have been plugged, to be secured by a lien upon his interest in the oil or gas in the land, and third, against the landowner, to be secured by a lien upon his interest in the land."

We have found no cases in which the courts have directly considered the character and extent of the obligations of landowners to plug abandoned wells under Article 6005, V. T. C. S. Therefore, the following discussion represents what we consider to be the proper construction of the statute in the light of court decisions which have construed some of the language of this article.

The first question posed by the Railroad Commission is as follows:

"1. 'A' owns the mineral rights, but none of the surface rights of the tract on which a well is located.

"QUESTION: Is 'A', the landowner, within the statutory definition? If not, is there a landowner?"

We assume that "A" has executed an oil and gas lease covering his mineral estate; otherwise, he would probably be an operator. Under these facts, we are of the opinion that "A" would be a "landowner" although not owning any of the surface estate. If "A" owns a real property interest in land upon which the well is situated (other than a non-participating royalty interest), he is an "owner of the land upon which the well is situated." For the Legislature to have excluded a mineral lessor from responsibility for

plugging merely because he owned no surface estate is most improbable, in view of the fact that such lessor probably received a bonus, delay rentals, and certainly the benefits of the exploration of his mineral estate.

Your second question is:

> "2. 'A' owns all of the property rights at the time the well is drilled but sells the surface and a fraction of the minerals before the well ceases to produce.

> "QUESTION: Is 'A' the landowner? If so, what is the extent of his liability?"

We understand this question to refer to a mineral lessor who owned the entire fee simple estate in surface and minerals prior to execution of an oil, gas, and mineral lease, and who, during the term of said lease and while minerals were being produced, sold his surface estate and a portion of his mineral estate. For the same reasons given above, "A" would be a landowner within the meaning of the statute by virtue of his retained ownership of an interest in the mineral estate.

Section 4 of Article 6005, V. T. C. S., states if the operator and nonoperator fail to comply with the Article, each landowner is responsible for his proportionate share of the cost of the proper plugging of the well. "A" would be responsible for that proportion of the cost of plugging as his mineral ownership bears to the entire mineral fee estate.

The Legislature, in Article 6005, V. T. C. S., has created a three-tiered scheme of responsibility. Under Section 2, the operator bears 100% of the responsibility for the plugging. The statute does not consider the percentage of his ownership of the working interest, but simply says "the operator of a well shall properly plug the well when required." Presumably, he can look to his nonoperators for reimbursement under the operating agreement.

The second tier consists of the nonoperators or owners of the working interest who are not responsible for the physical operation and control of the well. Each nonoperator is responsible "for his proportionate

share of the cost of proper plugging. " We are of the opinion that the Legislature intended to make the nonoperators collectively responsible for the plugging of the well in the event of the operator's failure.

Therefore, as between the nonoperators, each would be responsible for a portion of the entire cost of plugging not paid by the operator in the same ratio that his interest bears to the total nonoperating interest. Between the nonoperators and the landowners, the nonoperators are severally liable for the entire cost.

The "landowners" form the third tier of responsibility and are responsible for the entire cost of plugging upon default by operator and nonoperators. This responsibility is divided between the landowners according to their proportionate ownership of the mineral estate and not the ownership of the surface estate. Only the mineral estate stands to receive the benefits of exploration and production. The "landowners" are, therefore, responsible for that proportion of the entire cost of plugging which their respective ownerships bear to the entire mineral fee estate. They, of course, have claims for reimbursement under Section 5.

The next question is:

> "3. 'A' purchases a royalty interest under a drilling or producing well (no surface rights). The well ceases to produce.
>
> "QUESTION: Is 'A' a landowner? If so, what is the extent of his liability? "

The ownership of a non-participating royalty interest with no rights to bonus, delay rentals, or executive rights does not constitute its owner à "landowner. " The statute, in Subsection 3 of Section 1, specifically excludes royalty and overriding royalty owners from the status of operators or nonoperators: "It is understood that the terms 'operator' and 'nonoperator' as defined in this Article do not mean a royalty interest owner or an overriding royalty interest owner."

The definition of "landowner" requires that he hold a "mineral interest therein." The terms "mineral interest," "mineral rights," and "minerals" have repeatedly been distinguished from the terms "royalty," "royalty interest" by the Texas courts. As stated by the Commission of Appeals in Schlittler v. Smith, 128 Tex. 628, 101 S. W. 2d 543 (1937):

> "The words 'royalty,' 'bonus,' and 'rentals' have a well-understood meaning in the oil and gas business. Likewise, 'minerals' and 'mineral rights' have a well-recognized meaning. Broadly speaking, a reservation of mineral rights without limitation would include royalties, bonuses, and rentals, a conveyance of land without reservation would include all minerals and mineral rights. However, it is well settled that a grantor may reserve minerals or mineral rights and he may also reserve royalties, bonuses, and rentals, either one, more or all. Here we have a reservation of only 'royalty rights.' It is obvious, it seems to us, that this does not include a reservation of bonuses, or rentals, but only of an interest in oil, gas, or minerals paid, received, or realized as royalty. . . ."

The distinction between "minerals" and "royalty" is exhaustively treated in Vol. I, Williams and Meyers, Oil and Gas Law, Section 302, et seq.

We conclude, therefore, that a royalty owner does not own a "mineral interest" as that term has been defined by the courts, and is not a "landowner" within Article 6005, V. T. C. S. Accordingly, we answer Question No. 3, "No."

The fourth question is:

> "4. 'A' owns the surface and mineral rights of a property at the time production ceases. Thereafter, he sells all or a portion of his interest. Thereafter, the well is found to be a pollution source.
>
> "QUESTION: Is 'A' still the landowner? If so, what is the extent of his liability?"

We assume that by "at the time production ceases" is meant the time the well is abandoned.   Cessation of production does not necessarily correspond to abandonment.   A well may be "worked over" or various means may be used to restore production subsequent to the cessation of production, and while these operations are going on, the well would not be deemed to be abandoned.

"A" would fall under the statutory definition of a "landowner" and would be responsible for plugging the well on default by the operators and nonoperators.   His liability would be measured by his mineral ownership at the time of abandonment.   Therefore, he would be responsible for that proportion of the cost of plugging as his mineral ownership at the time of abandonment bore to the entire mineral fee estate.

The fifth question posed by the Railroad Commission is as follows:

> "5.   'A' owns the surface and minerals at the time of last production.   Thereafter, 'A' assigns his interest to 'B'.   After the assignment, the well is determined to be a polluting well.
>
> "QUESTION:  Is 'B' a landowner?   If so, what is the extent of his liability? "

In considering this question, we assume that by "the time of last production" is meant at the time of abandonment, and that "B" owned no interest in the property prior to the assignment from "A" to "B".   Under these circumstances, "B" would not be a "landowner" because he did not own any interest in the land until subsequent to abandonment.   Therefore, he would not be responsible for plugging.

Section 9 of Article 6005, V. T. C. S. , provides that, in the event the operators, nonoperators, and landowners fail to plug the well and the Railroad Commission does so, the Commission shall have a cause of action against each of the foregoing secured by a lien upon their respective interests in the fixtures, equipment, and machinery found or used upon the land and a lien upon the landowner's interest in the land.   Presumably, this lien would not apply to "B"'s interest in the land since he is not a landowner within the meaning of the statute.   "A" would, of course, still be personally responsible.

The sixth question is:

"6. 'A' owns surface and minerals at the time production ceases. 'A' dies, leaving 'B' and 'C' as heirs. The well is found to be a polluting well.

"QUESTION: Are 'B' and 'C' landowners? If so, what is the extent of the liability of each? Is the estate liable before distribution?"

If the words "at the time production ceases" refer to the time of abandonment, then "A" was the landowner. In the absence of any mention of heirs, personal representatives, executors, administrators, devisees, or the like, we are of the opinion that the statute does not provide for succession. The obligations imposed on "landowners" by Article 6005, V. T. C. S., are highly contingent, unliquidated, and would not appear to be debts recognized at Common Law. Their scope must be measured by the explicit terms of the statute. By limiting the obligations to "landowners" without mention of heirs or personal representatives and by defining landowner as the person owning the land at a particular time, namely, at the time of abandonment, the Legislature left no room to infer the succession of these obligations.

The seventh and last question posed by the Railroad Commission is as follows:

"7. 'A' purchases a tract of land on which, known or unknown to him, there are one or more non-producing wells. Thereafter, such wells are determined to be polluting wells.

"QUESTION" Is 'A' a 'landowner.' If so, what is the extent of his liability?"

The above question, as does Question 5, involves the liability of a grantee or successor in title to land upon which there are unplugged or improperly plugged wells. In such cases, responsibility depends on the time of acquisition. "The time of abandonment" is fixed by the statute as the determinative time. If, therefore, "A" purchased the land after

p. 192

abandonment, he is not a "landowner". If he purchased before abandonment, he is a "landowner" and his liability is determined by the percentage of his mineral fee ownership.

### S U M M A R Y

In determining who are "landowners" in the context of Article 6005, V. T. C. S., the time of acquisition is of importance since he who owns the land at the time the well is abandoned is the "landowner", made liable for the cost of plugging if the operator and nonoperators do not fulfill their obligations.

Very truly yours,

JOHN L. HILL
Attorney General of Texas

APPROVED:

LARRY F. YORK, First Assistant

DAVID M. KENDALL, Chairman
Opinion Committee